IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
JUDGE WALKER D. MILLER

Civil Action No. 06-cv-00223-WDM-CBS

MARLA SEWELL and BROOKE SEWELL,

      Plaintiffs,

v.

GREAT NORTHERN INSURANCE COMPANY, a foreign insurance corporation, HAYS
COMPANIES, a Colorado corporation, and PROFESSIONAL LINES INSURANCE
BROKERAGE, INC., a Colorado corporation,

      Defendants.

---

## ORDER ON MOTIONS FOR SUMMARY JUDGMENT

---

Miller, J.

      This matter is before me on the motion for summary judgment filed by defendant

Hays Companies ("Hays") (doc no 50), the motion for summary judgment filed by Great

Northern Insurance Company ("Great Northern") (doc no 81), and the motion for

summary judgment filed by defendant Personal Lines Insurance Brokerage, Inc. ("PLI")

(doc no 84).  In addition, I will address the two motions to strike various exhibits

submitted in connection with the Plaintiffs' opposition to the motions (doc nos 72 and

110) .  I have reviewed the parties' written arguments and find oral argument is not

required.  For the reasons that follow, the motions will be granted.

Background

      As an initial matter, I note that Plaintiffs failed to follow my Pretrial and Trial

Procedures with regard to their responses to the motions for summary judgment.  They

did not provide a response to Hays' statement of undisputed facts in accordance with my procedures. In addition, Plaintiffs did not provide specific references to record material to establish several of their factual assertions, disputed or undisputed. Plaintiffs also did not accurately summarize the content of certain portions of the record, which detracts from their credibility.

The following facts are undisputed or, where disputed, are established by evidence in the record, as opposed to Plaintiffs' conclusory assertions.

Plaintiff Marla Sewell contacted PLI, an insurance brokerage, to obtain quotes for a homeowners insurance policy, car insurance policy, and umbrella excess insurance policy around August 2001. She spoke with Virginia Nied, a PLI employee. Ms. Sewell did not specifically discuss excess uninsured/underinsured (UM/UIM) motorist coverage under the umbrella policy or request it. She had been advised by her father to look into obtaining an umbrella policy but did not know what was included. Ms. Sewell alleges that Ms. Nied told her "[t]hat we would have a million dollars' coverage if we were involved in an accident" but does not claim that this statement concerned excess UM/UIM coverage. Ms. Nied sent Ms. Sewell several quotes for primary automobile insurance from which Ms. Sewell selected a policy. In November 2001, Mary LaHeist, another PLI employee, sent an umbrella application and policy from Great Northern with a letter asking the Sewells to "please take time to examine [the policies] carefully to make sure the limits of coverage meet your needs and that no items have been omitted."

The application, which was filled out by PLI, contained a section entitled

2

"Coverages," and showed a policy amount of $1 million, with premium amounts listed. However, just below this, the application contained a separate subheading entitled "Optional Coverages to Apply," which listed "Uninsured Motorist" and "Underinsured Motorist."  The portion of the application listing premiums also contained a separate section for premiums for UM and UIM coverage.  No "Optional Coverages" choices were filled in and no premiums were listed for UM/UIM coverage.  Nonetheless, Ms. Sewell read the application, signed it and returned it to PLI.  She did not indicate on the application that she wished to have excess UM/UIM coverage and did not call PLI or any one else to request such coverage or to confirm whether her policy included it. Rather, Ms. Sewell testified in her deposition that she did not notice the blanks on the application and simply assumed that her umbrella policy included excess UM/UIM coverage because her underlying primary car insurance included both liability and UM/UIM coverage.  Although no one ever told her that her umbrella policy automatically included UM/UIM, no one specifically told her otherwise.

The umbrella policy for 2001-2002 had an effective date of November 27, 2001. The coverage summary provided the following: "Amount of liability coverage: $1,000,000."  It went on to explain that "[y]our liability coverage covers damages for which you are legally responsible."  The summary listed the homes and vehicles covered and showed that coverage for each was "EXCESS LIABILITY ONLY."  Below this appeared the following statement: "Whenever vehicles are shown we have included the type of Uninsured or Underinsured (UM/UIM) coverage you have selected. *For vehicles where no UM/UIM appears there is no coverage.*" (Emphasis added).  The

3

policy itself explained that "Excess Liability Coverage" meant that the insurance company would cover damages the insured "is legally obligated to pay."  A separate subsection entitled "Excess uninsured motorists protection" provided that "This coverage is in effect only if excess uninsured motorists protection is shown in the Coverage Summary" and explained that the insurance company would cover damages the insured "is legally entitled to receive from the owner or operator of an uninsured motorized land vehicle."  The same language appeared in each policy renewal; the Sewells renewed the policy in 2002, 2003, and 2004.

In late 2003, when Colorado eliminated its no-fault automobile liability law, PLI notified the Sewells that Personal Injury Protection ("PIP") coverage would be eliminated from their primary automobile policy.  Ms. Sewell contacted Ms. LaHeist to ensure that her primary automobile coverage was adequate in light of the changes.  Ms. LaHeist assured her that it was.  Ms. Sewell then asked, "Well, my umbrella policy should kick in, anyway, so I shouldn't have a problem, right?," which Ms. LaHeist confirmed.  Again, Ms. Sewell did not specifically communicate her assumption that her umbrella policy contained excess UM/UIM coverage or inquire whether the policy included this type of insurance.  In addition, in that call, Ms. Sewell did not state that she wanted a comprehensive review of all of her insurance coverage or identify any particular need that she wished to address, other than the effect of the elimination of PIP coverage.  Rather, Ms. Sewell "was hoping [Ms. LaHeist] would bring up any particular needs that I needed met."

Around the same time, certain assets of PLI were purchased by Hays and Hays

assumed responsibility for servicing the Sewells' accounts.  The Sewells renewed their policies twice through Hays after the acquisition.

On December 5, 2004, Mr. Sewell was hit by an uninsured motorist and died from his injuries.  Ms. Sewell filed a claim for excess UM/UIM benefits under the umbrella policy, which Great Northern denied because the Sewells had not applied for nor paid for such coverage.  Ms. Sewell and her minor daughter then filed this lawsuit against the defendants asserting the following causes of action, as set forth in their Amended Complaint and Jury Demand: (1) breach of contract/reformation; (2) negligent misrepresentation; (3) breach of fiduciary duty; (4) breach of duty of good faith and fair dealing; (5) deceptive trade practices.

## Standard of Review

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56.  A factual issue is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).

Where "the moving party does not bear the ultimate burden of persuasion at trial, it may satisfy its burden at the summary judgment stage by identifying 'a lack of evidence for the nonmovant on an essential element of the nonmovant's claim.'"  *Bausman v. Interstate Brands Corp.*, 252 F.3d 1111, 1115 (10th Cir. 2001) (quoting *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998)).  Then, "[t]o avoid summary judgment, the nonmovant must establish, at a minimum, an inference of the presence of each element essential to the case."  *Id*.

5

<u>Discussion</u>

1.      <u>PLI's Motion for Summary Judgment</u>

Because several of the claims against the other defendants are derivative of PLI's

alleged liability, PLI's motion for summary judgment is dispositive of nearly all issues.

A.      <u>Breach of contract/reformation</u>

Plaintiffs' first cause of action apparently is based on their allegation that PLI

contracted to place "appropriate" insurance protection for the Plaintiffs and that the

umbrella insurance policy should be reformed to include UM/UIM benefits.  In its motion

for summary judgment, PLI argues that it agreed to obtain an umbrella policy for Plaintiffs

and satisfied its obligations in this regard.  Accordingly, no breach occurred.  I agree.  The

record is devoid of any evidence indicating that Ms. Sewell requested an umbrella policy

containing excess UM/UIM coverage.   According to her own testimony, she did not

expressly request excess UM/UIM coverage when she first asked for quotes from PLI nor

did she include it in her application, where the option was clearly indicated.  Ms. Sewell's

mere uncommunicated assumption that the policy did or would contain this insurance is

insufficient to establish a contract.

Moreover, despite Plaintiffs' conclusory arguments in their response brief, there is

no genuine issue of fact as to whether PLI agreed to place "appropriate" insurance for

Plaintiffs.  Ms. Sewell's own testimony establishes that she contacted PLI and asked for

quotes for specific types of insurance and then selected from various options and

coverage amounts.  Her vague assertions that she wanted to PLI "to represent me" and

that she was "going on [Ms. Nied's] expertise" do not indicate that she made any request

sufficient to put PLI on notice about specific concerns she had.  PLI's letter instructing the Sewells to review the policies and coverage amounts affirmatively placed the responsibility on the Sewells to make sure that they received the coverage they wanted.  It is well established that under Colorado law, "insurance agents have a duty to act with reasonable care toward their insureds, but, absent a special relationship between the insured and the insurer's agent, the agent has no affirmative duty to advise or warn" the customer of provisions in the policies or of all existing, available insurance suitable for the customer's needs. *Kaercher v. Sater*, 155 P.3d 437, 441 (Colo. App. 2006), *cert. denied*, *Kaercher v. Sater*, 2007 WL 807272 (Colo. March 19, 2007).  Insurance agents are not "personal financial counselors or risk managers, approaching guarantor status" and therefore have no continuing duty to advise or direct an insured to obtain additional coverage.  *Id.* (citation omitted).  In general, absent special circumstances, an insurance agent discharges his or her duty of reasonable care if the agent obtains the insurance requested by the customer or informs the customer that the coverage cannot be had.  *Bayly, Martin & Fay, Inc. v. Pete's Satire, Inc.,* 739 P.2d 239, 243 (Colo. 1987); *see also Hill v. Allstate Ins. Co.,* 354 F. Supp. 2d 1192, 1196-98 (D. Colo. 2004) (collecting cases).

As in *Kaercher*, there is no evidence that the Sewells had a special relationship of entrustment or that PLI held itself out as knowledgeable beyond the ordinary scope of an insurance agent/insured relationship.  Plaintiffs cite to no record evidence that would permit a reasonable juror to infer that Plaintiffs requested or PLI undertook to

comprehensively advise the Sewells concerning their insurance coverage needs.[1] Plaintiffs point to various marketing materials downloaded from PLI's website to support their argument that PLI promised to review and assess Plaintiffs' coverage needs.[2] Plaintiffs have not demonstrated that this material was in circulation at the time Ms. Sewell obtained her insurance or that she read or relied on it; in fact, the evidence shows otherwise.   Moreover, it is simply generic marketing copy containing broad statements about PLI's philosophy and experience and cannot be construed as a specific promise to comprehensively review Plaintiffs' insurance needs in the absence of a request to do so or additional consideration for such services.   Ms. Sewell's mere "hope" that PLI would make specific suggestions does not transform the relationship into one imposing special duties.   Nor does Ms. Sewell's conversation with Ms. LaHeist concerning the effect of the elimination of PIP, which again involved Ms. Sewell's request for information about her underlying automobile policy, not an agreement by PLI to ensure the adequacy of the Sewells' coverage.[3]

PLI further argues that contract reformation is not appropriate here because this equitable remedy applies only when the evidence demonstrates that the parties made a

---

[1]I do not consider Plaintiffs' proffered expert report, which is stricken for the reasons stated in Part 4 of this Order.

[2]Many of the copies of these materials provided by Plaintiffs are virtually unreadable.

[3]Plaintiffs assert that Ms. LaHeist believed the Sewells were underinsured, which mischaracterizes the record.  Ms. LaHeist's testimony is that she believed the Sewells were underinsured with respect to their primary auto insurance because they did not have Medical Payment coverage, which was apparently remedied, not that they were underinsured as a general matter.

mutual mistake or one party made a unilateral mistake and the other engaged in fraud or inequitable conduct.  *Boyles Bros. Drilling Co. v. Orion Indus., Ltd.*, 761 P.2d 278, 281 (Colo. App. 1988).   There is no evidence that PLI or Great Northern ever intended to contract with the Sewells to provide them with excess UM/UIM benefits but that the policy mistakenly failed to reflect that agreement.  Rather, Ms. Sewell made a unilateral mistake in assuming that she had such coverage, even though she did not request it and did not include it in the application she signed despite a clear indication that it was an option.  This does not justify reformation of the policy.  In addition, as discussed below, there is no evidence of fraud or misconduct by PLI.[4]  Accordingly, I see no basis for reforming the policy to include UM/UIM benefits.

   B.   <u>Negligent misrepresentation</u>

   Plaintiffs' second claim is based on their allegation that defendants "led the Sewells to believe that appropriate insurance protection had been placed" or that defendants were negligent in failing to place "said coverage."   A claim of negligent misrepresentation requires evidence establishing the following elements, as applicable here: (1) the defendant gave false information to the plaintiff; (2) the defendant gave such information to the plaintiff in the course and scope of the defendant's business or profession; (3) the defendant gave the information to the plaintiff for the guidance or use of the plaintiff in a business transaction; (4) the defendant was negligent in obtaining or communicating the

---

[4]In their response brief, Plaintiffs confusingly assert "There was no mistake. [PLI] never apparently considered discussing such coverage with the Sewells.  Such conduct is not a mistake."  Plaintiffs deny any mistake but provide no other legal authority or factual basis that would justify reformation in these circumstances.

information; (5) the defendant gave the information with the intent or knowing that the plaintiff would act or not act in reliance on the information; (6) the plaintiff relied on the information; (7) the plaintiff incurred damages as a result of his or her reliance on the information supplied by the defendant.  CJI, Civil 9:4 (4th ed.).

PLI argues that the undisputed facts show that no false information was supplied to Ms. Sewell.  I agree.  It is undisputed that no representative of PLI (or any other defendant) ever told Ms. Sewell that the umbrella policy contained excess UM/UIM benefits or that Ms. Sewell ever discussed obtaining or requested excess UM/UIM benefits with any representative of any defendant.  Moreover, the policy clearly disclaimed the existence of UM/UIM benefits, as it provided in several places that unless such benefits were shown in the coverage summary, there was no coverage.  Similarly, as discussed above, there is no evidence that any defendant represented that it had undertaken to ensure that the Sewells had "adequate" insurance.

In their response brief, Plaintiffs assert that in 2003, Ms. LaHeist informed Plaintiffs that "their UM/UIM coverage would cover the gap in coverage" created by the repeal of PIP benefits.  This is not an accurate summary of the testimony on the record and even Plaintiffs concede that this statement "could be true in certain respects."  Ms. Sewell testified that she asked Ms. LaHeist "if she thought I needed to increase any of the coverages on my auto policy" in light of the repeal of PIP and Ms. LaHeist informed her that she did not.  The record does not indicate that Ms. LaHeist represented that the umbrella policy contained UM/UIM benefits or that such benefits would cover the gap created by PIP.  Ms. LaHeist's mere confirmation that the umbrella policy would "kick in,"

10

which was true as far as liability coverage, does not constitute false information.  Plaintiffs appear to argue that the Sewells' coverage under their primary underlying auto policy was less than it had been before the repeal of PIP.  However, Plaintiffs provide no record evidence to support this assertion and do not demonstrate how this could be material.

Finally, Plaintiffs argue that the application for the umbrella policy, which was filled out by PLI but signed by Ms. Sewell, could have led the Sewells to believe "that information could be missing in the application and yet they had $1,000,000 in umbrella coverage which would include UM/UIM coverage."  Again, Plaintiffs do not identify a representation made by PLI that would have caused Plaintiffs to believe that their policy would contain these benefits.  Instead, Plaintiffs point to a provision in the application that requires an applicant to check a box to affirmatively elect or decline UM/UIM coverage.  However, this section by its terms was "Applicable only in Louisiana, New Mexico, Ohio, Tennessee and Vermont," not Colorado,  and Plaintiffs offer nothing more than their conclusory assertion to show that Ms. Sewell relied on this provision or believed that the application was incomplete and would later be filled out to include UM/UIM benefits.[5]  Accordingly, this claim must be dismissed.

C.    Breach of fiduciary duty

As I have already noted, nothing in the record creates a genuine issue of material fact as to whether PLI had anything other than an ordinary insured/agent relationship with Plaintiffs.  There was no *per se* special relationship and no affirmative undertaking to

---

[5]Moreover, such an expectation would be unreasonable after Plaintiffs received the policy, which expressly disclaimed the inclusion of UM/UIM benefits.

advise or warn the Plaintiffs about whether they needed additional UM/UIM coverage. Plaintiffs requested certain coverages and policies, PLI obtained them, and PLI answered specific questions about the coverage when asked.  Accordingly, PLI had no additional fiduciary duty to Plaintiffs and this claim must fail.

> D.    Breach of duty of good faith and fair dealing

Plaintiffs' Amended Complaint alleges a breach of the duty of good faith and fair dealing based on C.R.S. § 10-3-1113 and C.R.S. § 10-3-1104.  However, no private cause of action exists under C.R.S. § 10-3-1104.  *Schnacker v. State Farm Mut. Auto. Ins. Co.* 843 P.2d 102, 104 (Colo. App. 1992).  In addition, C.R.S. § 10-3-1113 applies to insurers; it is undisputed that PLI is an agent and not an insurer.  *See also Cary v. United of Omaha Life Ins. Co.,* 68 P. 3d 462, 466 (Colo. 2003) ("only the insurer owes the duty of good faith to its insured; agents of the insurance company-even agents involved in claims processing-do not owe a duty, since they do not have the requisite special relationship with the insured.").

In their response brief, Plaintiffs assert the existence of various duties, including a duty to "protect the Sewells or act as an advocate for them" with their insurers or to clear up ambiguities in the policies.  Plaintiffs also assert that if PLI believed that its client should be protected by excess UM/UIM coverage (which is not in evidence here, even when the record is construed in the light most favorable to Plaintiffs), then PLI breached some duty by failing to discuss such coverage with the Sewells.   Plaintiffs cite no legal authority to support the existence of these alleged duties and their assertions directly conflict with established case law holding otherwise.  Accordingly,  summary judgment is

appropriate on this claim.

      E.    <u>Deceptive trade practices</u>

      PLI argues that Plaintiffs' Colorado Consumer Protection Act ("CCPA") claim fails because they have not demonstrated any evidence that any challenged practice impacted the public. I agree. An essential element of a CCPA claim is the existence of a deceptive trade practice that "significantly impacts the public as actual or potential consumers of the defendant's goods, services, or property." *Rhino Linings USA, Inc. v. Rocky Mountain Rhino Lining, Inc.,* 62 P.3d 142, 147 (Colo. 2003). The relevant considerations in determining public impact are (1) the number of consumers directly affected by the challenged practice; (2) the relative sophistication and bargaining power of the consumers affected by the challenged practice; and (3) evidence that the challenged practice has previously impacted other consumers or has the significant potential to do so in the future. *Id*. at 149. Plaintiffs' claim concerns alleged conduct affecting only the Sewell family, which indicates a private wrong, even if any trade practice could be considered deceptive.

      Plaintiffs argue in their response brief that PLI's advertising is deceptive. As I have already determined, PLI's generic marketing material contains nothing that would alter the normal relationship between an insured and the insurance agent and did not create any affirmative duty to ensure the adequacy of Plaintiffs' insurance coverage without an actual request to do so. The remaining assertions in Plaintiffs' response brief again concern only alleged wrongs committed against the family, not the public in general. Plaintiffs have not demonstrated a genuine issue of material fact as to any deceptive trade practice or public

13

impact; therefore, this claim also fails.

In light of the above, all of Plaintiffs' claims against PLI should be dismissed and summary judgment should enter in favor of PLI as a matter of law.

2.      Great Northern's Motion for Summary Judgment

        A.      Breach of Contract/Reformation

Great Northern argues that summary judgment should enter on this claim because the umbrella policy did not include excess UM/UIM benefits and, therefore, Great Northern did not breach any contract by refusing Plaintiffs' claim.  I agree.  The policy is not ambiguous in this regard.  It explains the difference between excess liability and UM/UIM coverage and it clearly disclaims coverage for UM/UIM benefits where those benefits are not included in the coverage summary.  In addition, as discussed above, there is no basis for reforming the policy, as Ms. Sewell never requested or purchased UM/UIM benefits and there was no mutual mistake in the formation of the contract.

In their response brief, Plaintiffs make the novel argument that "there is a mutual mistake because Plaintiffs believed that they had secured UM/UIM coverage and Great Northern apparently believes that it did not underwrite UM/UIM coverage under the policy." Response at 12.  Even if Plaintiffs' argument was not based on the conclusory assertion that the policy in fact does include UM/UIM benefits, this situation would not involve a mutual mistake but rather two independent unilateral mistakes.  However, there was no agreement by Great Northern to provide excess UM/UIM coverage because Plaintiffs never expressly requested it (either verbally or in their application) or paid premiums as consideration for such coverage; accordingly, there is no antecedent agreement which the

14

writing now needs to reflect. *Carder, Inc. v. Cash*, 97 P.3d 174, 180-81 (Colo. App. 2003) (reformation appropriate only when instrument does not represent the true agreement of the parties).

In Plaintiffs' response brief, they contend that they did in fact request excess UM/UIM coverage because they increased their underlying coverage in order to qualify for the umbrella policy. However, Ms. Sewell admitted that she simply assumed that the umbrella policy contained these benefits, as she never discussed excess UM/UIM coverage with any representative of any defendant. Indeed, she did not even notice blanks in the application where she could apply for it. Plaintiffs' second argument is that they relied on PLI to advise them on adequate coverage, which is also unavailing for the reasons already discussed.

Plaintiffs further argue that the contract is ambiguous. Plaintiffs provide no authority to demonstrate that this is a legal basis for reforming the contract. Moreover, I conclude that the policy is not ambiguous with respect to whether it includes excess UM/UIM benefits in light of the clear language in the coverage summary. The policy stated "For vehicles where no UM/UIM appears there is no coverage" and "[Excess uninsured motorist protection] is in effect only if excess uninsured motorist protection is shown in the Coverage Summary." Next to the vehicles listed on the Sewells' policy, the coverage summary showed "EXCESS LIABILITY ONLY." Plaintiffs contend that an unrelated section of the policy, which discusses required coverage amounts for underlying insurance, creates an ambiguity because it refers to "underlying insurance" as "all liability coverage" including underlying UM/UIM coverage. I disagree that ambiguity can be fabricated by

such a strained reading to, in effect, change the unambiguous coverage.

        B.      <u>Remaining Claims</u>

Plaintiffs' remaining claims against Great Northern are based on actions by PLI or on the assumption that the umbrella policy in fact should have included or did include UM/UIM benefits.  Given judgment in favor of PLI, no liability can attach to its principal, Great Northern, on *respondeat superior* grounds.  Moreover, since the policy unambiguously does not contain excess UM/UIM benefits, and there is no basis for reforming it to include such coverage, the remaining claims also fail.

3.      <u>Hays' Motion for Summary Judgment</u>

Hays moves for summary judgment on the grounds that all the alleged acts underlying Plaintiffs' claims occurred before its acquisition of PLI and Hays did not assume PLI's liability in the acquisition.  Hays' processed two renewals of the umbrella policy but the Sewells at no time communicated with any representative of Hays.  Hays argues that Plaintiffs' claims also fail on the merits because Hays had no contract with Plaintiffs, made no representations to them, had no fiduciary duty to Plaintiffs, engaged in no misconduct with respect to the renewals, and did not engage in any alleged wrongful conduct having an impact on the public.

In their response brief, Plaintiffs deny that they seek to hold Hays liable under a successor theory.  Instead, they assert, without legal or factual support, that when Hays assumed responsibility for servicing Plaintiffs' accounts that Hays became a fiduciary of Plaintiffs and should have, *inter alia*, alerted them to the lack of excess UM/UIM coverage.  As discussed above, such claims are inconsistent with Colorado law.  Plaintiffs apparently

rely on a letter from Hays just after the acquisition notifying the Sewells that Hays would be taking over the accounts as grounds for imposing heightened duties.  The letter contains generalized statements concerning the company's "commitment to personalized insurance consultation and customer satisfaction" and its work "developing insurance options specifically designed to minimize risk and protect our clients' interests." Again, under the standard discussed in *Kaercher*, this letter does not create a contract or an undertaking by Hays that would impose duties beyond those in an ordinary insured/agent relationship.  Plaintiffs' reliance on their expert report to create issues of fact in this regard is also unavailing.  Accordingly, summary judgment should enter in favor of Hays.

4.    <u>Motions to Strike Expert Report</u>

Plaintiffs proffer an expert report and opinions prepared by Richard W. Laugesen, an attorney, as grounds for arguing that there are issues of material fact concerning the scope of the duties of the defendants.  Hays filed a motion to strike the report (doc no 72), as did PLI (doc no 110).  Both defendants argued that the report was not properly authenticated and, therefore, is not admissible for purposes of summary judgment. Moreover, Hays argues that the report contains inadmissible conclusions or opinions of law.  Plaintiffs did not respond to the motions to strike.

I will strike the report on both grounds.  The report is unsworn and, as such, is hearsay evidence and not admissible for the purposes of summary judgment. *Sofford v. Schindler Elevator Corp.*, 954 F. Supp. 1459, 1462 (D. Colo. 1997).  Although this defect could be cured, the more significant problem with the report is that the opinions relied on to defeat summary judgment are simply legal conclusions based on Laugesen's opinion

of what the jury should find or what the law should be.

It is well established that expert testimony on what the law provides is inadmissible. *Specht v. Jensen*, 853 F.2d 805 (10th Cir. 1988). "Generally, an expert may not state his or her opinion as to legal standards nor may he or she state legal conclusions drawn by applying the law to the facts." *Okland Oil Co. v. Conoco Inc.*, 144 F.3d 1308, 1328 (10th Cir. 1998). These standards apply to expert reports. *Simmons Foods, Inc. v. Capital City Bank*, 58 Fed. Appx. 450 (10th Cir. 2003). Accordingly, Mr. Laugesen's report is not admissible for consideration of the defendants' motions for summary judgment and the defendants' motions to strike should be granted.

Accordingly, it is ordered:

1.     The motions for summary judgment filed by the defendants (docs no 50, 81, and 84) are granted.   Summary judgment is entered against Plaintiffs and in favor of defendants and this case is dismissed with prejudice.

2.     The motions to strike Plaintiffs' expert report (doc nos 72 and 110) are granted.

3.     Defendants may have their costs.

DATED at Denver, Colorado, on May 16, 2007.

BY THE COURT:


s/ Walker D. Miller
United States District Judge